Good morning. Good morning, Your Honors. May it please the Court, my name is Matt Powell, and I represent the defendants and appellants, California Pacific Bank, Richard Chee, Akilah Chin, Kent Chin, and William Moe. I understand I have 15 minutes. For argument, I'd like to reserve 3 minutes if I could, please. Okay. Watch the clock. I'll try to help you, but you are the master of your own fate, so to speak. Thank you, Your Honor. Your Honors, the Department of Labor engineered this lawsuit. If the DOL had not directed the FDIC to deny the bank's application to repurchase its stock, we would not be in this courtroom today. Counsel, doesn't the record indicate that the bank has repurchased the shares of a lot of other people without the approval of the FDIC? No, Your Honor. The bank is required by law to get the FDIC's approval to repurchase any stock. That's not my question. I apologize. My question is, hasn't the bank repurchased the shares of a number of its shareholders without getting that approval? Or at least individual officers in the bank. Thank you, Your Honor. Yes, the bank has not. An individual officer, Alan Chee, did. Okay. Okay. Now, and let me emphasize, Mr. Chee, Alan Chee, is Richard Chee's son. He's also a senior loan officer at the bank. Alan Chee was under absolutely no legal obligation to repurchase the stock. The reason Alan Chee repurchased the stock was because he wanted to help the bank, he wanted to help his father, he wanted to help the trustees, and most of all, he wanted to help the plan participants. Once the Department of Labor told the FDIC to deny the bank's application to repurchase its stock, the plan participants had no way to sell the stock, as we know. Go ahead. I thought that the request for permission went out at the same time that you announced the termination or closed to it. In other words, the bank hadn't really made any preparation in advance to get permission to sell the stock. Your Honor, just chronologically, the plan was terminated on December 31, 2010. About two months later, March 1, 2011, the bank made its initial application to the FDIC for approval to repurchase the stock. But the plan says that the termination was required to give the cash. I mean, it's pretty clear in 10.4. Payment to such participants shall be made in cash as soon as practicable after liquidation of the assets of the trust, but not later than one year following the date of termination. Correct. So at the time when you decided to terminate, the DOL was already investigating. So you didn't work through the investigation so that you could get permission. You just pulled the trigger, as I understand it. Let me be clear. The DOL's investigation had been going on for four years. It showed no sign of ending. So the plan administrator determined that we'll just terminate the plan, and they elected to terminate the plan. Did they ask whether they could get approval to liquidate so that they could make good on the Section 10.4 requirement? Did they talk to DOL before they made that determination? They had not talked to DOL because they didn't need the DOL's permission. But they did in order to comply with the contract, right? And to comply with the plan document, the plan document required the plan to distribute cash within one year of the date of termination. Now, when the plan was terminated, less than at that point, about four months earlier, the plan administrator, as the CEO of the bank, had asked the FDIC for permission to repurchase stock from a plan participant for $1,275 a share. And that was granted. No questions. It was granted promptly. So the bank had just asked the FDIC for approval to repurchase the stock. The FDIC had just granted approval to repurchase the stock. So when the plan was terminated, the bank and the plan administrator assumed that the FDIC would promptly approve the application to repurchase the stock. So they expected that there would be no problem. The bank had more than enough cash available. The bank could have declared a cash dividend that exceeded the amount paid to the plan participants by three times. So it has plenty of cash. It's ready to do so. It's willing to do so. And it sends out the notice to the plan participant saying, we will purchase your stock. And at the same time, it applies to the FDIC for permission to repurchase the stock. So you're saying the bank had reason to believe that DOL would have approved their repurchase of the stock but hadn't actually confirmed that with DOL. Do I understand your position on that? The bank had not gone to the DOL and asked it for authorization to repurchase the stock. But it had reason to believe that they would get the approval when they did ask. Is that right? Well, one, it does not need the DOL's approval. It needs the FDIC's approval. And the bank had no reason to think the DOL would object. In fact, I think the – I'm going to depart a little bit from the record because I don't think we have in the record what the plan administrator assumed the DOL would think, other than that this investigation had been going on for four years. And clearly, it seemed like it would be in everybody's best interest to terminate the plan, liquidate the assets. It did not need the DOL's approval to do that. It did – the bank did need the FDIC's approval to repurchase the stock. You know, I'm puzzled by your position, Counsel. You say the investigation had been going on for four years. Correct. So you were aware the government was concerned. You were aware that you needed to comply. And yet, when you terminated this plan, you knew that you had to buy these folks out for cash within a year. Correct. Again, what led them to take that decision? Did you think that the investigation was going to go away, that somehow they would just say, well, they're going to buy them out, so that's not a problem anymore? What motivated them? Is there anything in the record that would give us a clue? There is. In Mr. Chee's declaration, in connection with the motion for summary judgment, he talks about the various factors that motivated the – the plan administrator recommended the plan be terminated. And it was first the ongoing investigation by the IRS, then the ongoing investigation by the DOL. Let me emphasize a point. This investigation goes on for four years. Every time the issues would be resolved with the investigator, mostly through the efforts of Brian – or, I'm sorry, Brian Nash, the certified public accountant assisting the bank, Mr. Nash would answer all the questions, then the DOL would get a new investigator, and they'd start again. So – and one point I really want to emphasize, there's not a single issue in this litigation that relates to something the DOL found during that four-year investigation. Every issue in this litigation arises after the bank – I'm sorry, the plan administrator recommends that the plan be terminated and the trustees terminate the plan. It's issues that arise after that that are the basis for this litigation. At the time, nobody – there's no evidence that anybody thought this would be a problem. In fact, as I pointed out, the evidence in the record indicates that less than four months before the plan was terminated, the bank had been able to buy all the stock of a planned participant for $1,275 a share with no problem. Nobody had objected. The FDIC was aware of this ongoing investigation. This was a fairly straightforward transaction where the planned participants were being paid the appraised value of the stock. Okay, now I'm going to pause. Have I answered the questions that you have? Well, you have cited what you believe is an answer to the question. You know, the reality is they did find some – what they consider to be some irregularities with respect to a loan. They found self-dealing from their perspective. Whether that was discovered before the determination to terminate the plan is a matter that only the record could indicate. But I'm just – you know, these are obviously people that are smart. They're capable people. I'm just surprised that they thought that by terminating the plan without a certainty to be able to conform to it, that they didn't realize they were going to put their foot in a bear trap. I think they were fairly certain they could conform to it. Addressing the two other issues, basically the decision to call the account receivable and to distribute the account receivable happened in 2011 after the plan was terminated. The decision to return the overpayment happened in 2012. So those are issues that happen after termination. Let's take those. I mean, those are part of this litigation. Why did they do those when they knew the government was investigating everything? Did they think those were clean transactions? Absolutely. I mean, the plan administrator consulted with Brian Nash. Let's focus on the account receivables from seclusional culling management. $132,000. Mr. Chee consulted with Brian Nash to determine how the account receivable should be allocated. Bear in mind, until the trustees exercise the option to get paid the account receivable as opposed to hold on to their right to develop the property, there is nothing to be distributed. So in 2011, when the account receivable is paid, Mr. Chee enlists Brian Nash to help him make sure that the receivable is allocated as it should be among the plan participants based on their ownership interest in the stock. This was a fairly routine – I thought the issue was that some of that account receivable wasn't allocated to the plan participants but went to the bank. That's correct, Your Honor. Approximately 81,000 of the account receivable went to the bank, and the reason it went to the bank is because the bank held the stock, owned the stock that the dividend applied to. So what's the legal principle? Because I understand that the dividend was paid to the plan before the bank purchased or repurchased a portion of the stock. Is that correct? No, Your Honor. The dividend was not paid. Let me make sure I manage this. You drew a distinction between unallocated and allocated stock. Correct. And I had trouble understanding what you were really saying. You were saying that the participants didn't have an ownership interest in the unallocated stock until the loan was paid. Until the account receivable was paid. Until the account receivable was paid. I apologize. But the plan owned the stock. No. So the plan, so stock was contributed to the plan, but the plan didn't own it. What happened? Is that your position? Yes. And it's a bit complicated. And the provisions are cited in our reply brief at pages 24 and 25. But what happened is stock was allocated to the plan. Excuse me. Stock was allocated or the bank contributed stock to the plan? Stock was purchased by the plan through loans. But it was not allocated to the plan participants. But the plan owned that stock at the time. It held the stock at the time until the stock was repurchased by the bank years before the dividend actually was liquidated. Right. But the dividend was given to the plan. The plan got a dividend on the stock while it owned the stock. Correct. And then it was liquidated later. But what difference does that make? At the time the stock was with the plan, there was an option to either get an interest in this real property and develop the real property or to have the account receivable paid. Was the option a valuable right that was owned by the plan? I would say it's a valuable right. But if they'd exercised the option to develop the property, nobody would have got anything. And I'd rather answer your questions. I've got about a minute and 30 seconds left. It's more important to me that I answer your questions if you have any. Well, I go back to my – I just had trouble understanding what you were saying. Judge Okuda put her finger on it. The stock was contributed to the plan. But I understood you to be arguing, well, not really. We gave you this lump of stock, but only half of it really you own. The other half the bank owns until you buy it, something like that. And then when we got the dividend, we reallocated it according to ownership interests. It's a tad complicated. Let me try and answer it, if I may, Your Honor. What happened is initially, and it's spelled out in our brief in more detail, the plan basically purchased stock from the bank by way of a loan. So when it purchased the stock, it owned the stock. We're not arguing that it only purchased one-half stock. It purchased the stock, and it was a loan. It purchased the stock. Who owned the stock at that time? At that point, it is owned by the bank, but it is not allocated to the plan participants. But what does that mean? How could it be owned by the bank if the plan purchased it? I apologize. I misspoke. It's owned by the plan, but it's collateral for a loan, and it's not allocated to the plan participants. We understand what collateral is. The bank has a security interest in it. But what does it mean when you say allocated as if that means something different than ownership and collateral? What it means is the stock, when it's initially purchased by the plan, the plan has a loan. Until the plan pays down the loan, the stock stays in what they call these unallocated stock accounts. No plan participant has an ownership interest. Only when the plan pays cash for the stock is it allocated to a plan participant. Is that like a layaway plan or something? Well, it's at that point. I don't think that's quite right. Because that's just the internal way that the plan is managing its valuable assets for the benefit of the plan participants. That's not a question about whether the plan owns the stock or not. The reason it's relevant is because before the stock is paid for or the loans are paid down and the stock can be allocated, the bank repurchases the stock. The money used to repurchase the stock pays down the loans. All the stock comes back to the bank. Well, so what? Because at the point when the plan owned the stock, it acquired the valuable right, the option, as a dividend. So the plan owns the dividend. What principle of law says some portion of the dividend goes back with the stocks when the bank repurchases it? Was there an agreement in place to that effect? Basically, it was that the dividends followed the stock. What's the principle of law that says dividends follow stock? I think it's the provisions of the plan document that make it. Well, can you point to the provision in the plan document? Section 5.3. And if I could, Your Honor, they're cited in the reply brief. They're laid out at pages 24 and 25. And that might be easier than me going through them. Okay. Do my colleagues have additional questions? I think the time is up. I must say this is an unusual perspective on fiduciary duty. You have enlightened us, I guess. Thank you, Your Honor. Thank you. Let's hear from the government. Go ahead. Good morning. May it please the Court, Eric Lund, on behalf of the Secretary of the United States Department of Labor. Your Honors, we ask that you affirm the Court's entry of summary judgment on behalf of the Secretary on Counts 1 and 2, as well as entry of judgment at following trial in this case. Your Honors, involving Count 1, I think it's important to understand exactly what's at issue. What's not at issue is whether or not the bank could buy the stock. But the issue was the abdication by the trustees and defendants of their obligation under the plan to distribute cash to the participants following a termination of the plan. Well, they say opposing counsel says it was good, ready, willing, and able to do it, and it was the Department of Labor, effectively by objecting to it, tied their hands and unexpectedly made it impossible. Well, Your Honor, the question at issue was whether or not stock was distributed to the participants instead of cash, and that's what happened here. It was there, if you look at the timeline, what happened. There's a decision made in December of 2010 to terminate the plan. Now, Your Honor asked what the motivation was. And what the motivation was is that the trustees and the defendants wanted to wash their hands of any responsibility to the participants. So they terminated the plan effective December 31, 2010. They send out a letter March 1, 2011, to the participants that's replete with misinformation. It tells them that their assets had been rolled over the previous year, February 2010, to accounts, and that they have 60 days from that rollover to ask the bank to repurchase money, and that the bank may or may not. And it makes absolutely no mention of Section 10.4's requirement that they get cash. After that, June of 2011, June 24, they make a distribution in the form of shares in the bank to the participants in direct violation of 10.4, and that's the violation. Well, they said that they would have made the cash available, and they do make that offer in their letter, but for the government's interference, unexpected interference. Your Honor, as far as their purported statements of interference and that sort of thing, the FDIC's denial. The FDIC's denial happened months after the violation occurred. The violation was independent of the FDIC's denial of the bank's request. The violation was the distribution of cash, or excuse me, distribution of shares instead of cash, and that's what they did. Let me make sure I have your time correct. You're saying that the plan trustees distributed the stock to the plan participants, made this kind of quasi maybe we'll buy your shares and maybe we won't, all before the FDIC said they would not permit the repurchase of the shares. That's absolutely correct, Your Honor. Roughly a four-month period? Yes, Your Honor. Did they have reason to believe that the FDIC would not object? That was the argument made by opposing counsel. I don't know what was in their minds, Your Honor. Well, they said that the FDIC had approved a prior application to purchase. Whether or not the FDIC had previously approved or they expected them to approve in the future doesn't change what their obligations were to the participants and beneficiaries of the plan, and that is very clearly drawn in 10.4 as you don't get to distribute anything but cash, and there are really very important reasons for that. It was the plan's obligation to liquidate the assets of the plan and make then the distributions to the participants in the form of cash, and that's the reason behind that is very important. It is much easier for the plan to make sales and to liquidate assets than it is for individual participants. Was this stock not registered, limited market, all that? It was relatively illiquid. They don't sell the stock on the stock exchange. Once they did it and assumed they violated the clear terms of the plan, stock is not cash, cash is different from stock, what would be the way that they could correct it? Say they decided they made a mistake and the next day they said, oh, we shouldn't have done that, but we did it, now how do we fix that? They couldn't force a buyback, and without permission they couldn't buy it back. What would they do? One of the problems that this whole situation created, and it's really a situation of their own making, is that once they make the transfer to the participants, the plan loses its ability then to sell the stock, and that's what's required under the plan. Could the government basically prevent the bank from ever terminating the plan by just precluding them from complying with 10.4? I mean, is that what you're saying? So if the FDIC never gives us permission, then they can never terminate the plan. Is that a possibility? Well, Your Honor, the 10.4 requires the plan to liquidate the assets of the trust and then make the transfer or the payment distribution to the participants in cash. In fact, in this case, two individuals bought stock, some of the stock from the participants. And again, the impossibility argument really is a red herring. That's not what the issue is. The issue is the clear violation of the plan's provision, 10.4, the cash be distributed. I hope I've answered your question. Let me just ask one other thing in terms of timing. When the stock was distributed, the four months before the FDIC said no, had they already asked him, that is, had the trustees asked the FDIC for permission to repurchase the shares? The trustees had asked permission but had not received permission. Okay. So they asked the permission. They haven't got it. They distribute the shares to the plan participants. They make a quasi-offering saying we may purchase some shares, we may not purchase some shares. At that point, they hadn't received any FDIC approval, right? Correct, Your Honor. And then the FDIC says no, right? Correct, Your Honor. Also, just a couple of things to note as well. The distribution in June was more than six months before the one-year period in 10.4 also ran. And also, the letter that was sent to the FDIC requesting permission didn't even ask permission to buy all the participants' stock, I think roughly half. And so, again, the undisputed facts. Would that in and of itself have violated the plan because they had to repurchase all the shares? The plan 10.4 required that the assets of the trust be liquidated and cash be distributed, which means all of the shares would have to be liquidated. So even the permit that was requested, had it been granted, would still not have permitted the plan to basically fulfill its obligation to buy all the shares? That is correct, Your Honor. No, it would allow them. It just wouldn't require it, right? I'm sorry, Your Honor? It wouldn't require it, but it would allow it. The repurchase? Yes. If they gave them permission, they could have bought all of it back. No, they could not have bought them all back. The request to the FDIC was to purchase less than all of the shares. That is correct. And the plan required them to purchase all of the shares. So I just wanted to be sure I understood this correctly. Oh, I understood it the other way. So that wouldn't have allowed them to buy all the shares back from the distributees? That is correct, Your Honors. So really the undisputed material facts certainly support the district court's entry of summary judgment on Counts 1. Regarding Count 2, Your Honors are absolutely correct. The account receivable and the distribution or the allocation, whether it was allocated to participants or it was not, is irrelevant. What's undisputed here is that the plan owned that account receivable. That's admitted in the audited financials of the bank and the ESOP, effective December 31, 2010. It's admitted in the trustee's resolution where they say it's the right of the ESOP to or the plan to make that demand. And also it is actually stipulated. It's a stipulation of fact that it's property or an asset of the plan that was entered into before trial. And also in defendant's opening brief, they say the facts are undisputed. At the time the plan was terminated, its assets included a $132,506 account receivable. Whether or not that was allocated to the participants is completely irrelevant. Counsel, I wonder if I could change the subject just for one thing. One aspect of the case that I am concerned about is what's the government's best authority that the district court can impose a higher rate of prejudgment interest than the general Treasury bill rate? Your Honor, the district court enjoys, of course, discretion on whether to give prejudgment interest and also what that rate would be. It's not unlimited. That's what I'm looking for. It's what is the authority to impose what is in effect a punitive rate in this case? Well, in this case, perhaps I can answer the question by what's not a punitive rate. Okay. And in this case, the court first made the first step of the determination was that prejudgment was appropriate. And then the question of what would be the appropriate interest rate. In this court or in this instance, the court looked at a voluntary compliance program that the Department of Labor has for people who voluntarily report and voluntarily then comply, and looked at the interest rate that the Department of Labor uses in those circumstances. And that interest rate is the IRC rate. And so the court considered that as part of the equities. Did the court make any finding that that rate was compensatory? Because our standard in the circuit is that the prejudgment interest rate should be compensatory, not punitive. That is correct, Your Honor. And looking at courts will look, I believe this Court in Price looked toward agencies and their expertise to determine what is compensatory in different situations. And in the case of the voluntary compliance program, that certainly is the consideration of what would be the proper compensatory rate. Is that in the regulations or the statute for the DOL regulations for applying the IRC rate? Is there anything that says that's a compensatory rate? I would have to check more clearly or more closely, for Your Honor, on that. And to follow on that, did the district court make a finding that the rate was compensatory? And if so, where in the record? I believe that the court found that based on the equities, it was the appropriate rate, including considerations of public policy, public policies being that. Well, but since the court effectively found that these folks violated their fiduciary duty, I'm not sure what equities there were. It seems to me that this was a punitive rate designed to punish these folks. What's to the contrary in the record? Your Honor, it wasn't a punitive rate designed to punish. What it was is the court looked at and weighed the equities of, on one hand, we have a public policy concern about a voluntary compliance program. This wasn't a voluntary compliance program. That's very correct, Your Honor. And the court said, you know, it would be a windfall for people who, other than people who voluntarily reported and voluntarily complied, that they would be paying a higher IRC rate than those that did not. And so by public policy, he felt that it was important to uphold that IRC rate and to apply it. That sounds like a punitive rate. No, not at all, Your Honor. It wasn't based on what the defendants did or did not do, but rather on what underpins the government's or the U.S. Department of Labor's voluntary compliance program, and that is the voluntarily that they reported and that they did. You said equities in your brief. I was taking that as sort of a vague argument that the district judge had assessed the loss value, the difference between cash and the limited unregistered stock and somehow figured, well, this rate is rough just as what they would have lost. But there was no effort to determine any loss, right? And I thought you just said that the district court said, well, if you got this rate for the voluntary compliance, then you got these folks over here. How is it fair that these folks pay less than the people who are involved in the voluntary compliance program? I think what the district court's opinion tries to draw the line is how do, when you have a voluntary compliance program like that, and that has been used in the ESOP or, excuse me, in the arrested context before, this, excuse me, applying the IRC rate, the SNOR environmental case out of the District of Arizona, and also discouragement cases from the SEC have used the same and similar underpinnings and considerations of the equities. It wasn't so much a punishment in any particular case, but looking when you have a voluntary compliance program that is important and a very important public policy interest, and how do you support that? And one of the ways is the application of an IRC rate. Now, we're not saying that in all cases it has to apply, but that it's appropriate for a district court to look at the fact that there is a voluntary compliance program like this. Okay. I think your time is up. Let me ask my colleague whether either has any additional questions of the government. I think not, and I think, Counsel, you've used your time, so we thank you both for your argument, and the case just argued is submitted. Thank you very much. Thank you, Your Honors.
judges: M. Smith, Ikuta, McAuliffe